# CASES

# THE COURT OF CHANCERY

### OF THE STATE OF NEW-JERSEY,

### OCTOBER TERM, 1837.

---

## John McKelway v. James Cook.

M., by indenture, leased to C. at a stipulated rent, a saw-mill with a quantity of water to drive it "equal to six horse power." At the time of executing the lease, it was generally understood, and believed by the lessor that a less quantity of water would constitute a horse power at the site of the mill, than was actually required, and the rent was graduated upon that erroneous assumption. *Held,*

That the complainant must suffer the consequences of his mistake, and that he was neither entitled to charge the defendant a higher rent than that stipulated in the lease, nor to restrain him from drawing a quantity of water equal to six horse power.

Nor will the complainant be entitled to relief although the defendant himself acted at the execution of the lease under the same erroneous impression, unless it appear that he expressly agreed that the stipulated power should be guaged upon such erroneous estimate.

THE complainant, in the bill of complaint by him filed, charges, that he, being the owner of a certain mill site in Trenton, in February, eighteen hundred and thirty-four, one William G. Cook, agent of the defendant, but not then known to the complainant to be such agent, entered into a verbal agreement with him, the purport of which was—1. That McKelway should erect a single saw-mill upon his site, of substantial ma-

terials, to be of certain dimensions; should furnish water to drive the mill, and should deliver possession of the mill, so furnished, to William G. Cook, or to such person or persons as he should substitute in his place, to occupy and enjoy for five years. 2. That the rent to be annually paid by Cook, or the person substituted by him, should be ascertained upon the completion of the mill, by adding to whatever sum McKelway should pay the Trenton Delaware Falls company for the water furnished, ten per cent. upon the amount of cost of building and materials for mill, and six per cent. on the site, valued at one thousand dollars.

A few days after the making of this agreement, William G. Cook called, with James Cook, the defendant, upon McKelway, and, disclosing his agency, James Cook expressed his approbation of the agreement, and assumed the performance on his part. Doctor McKelway immediately proceeded, under the agreement, to put up the mill, and in the following September completed it, at a cost of two thousand two hundred and forty dollars, and delivered it into the possession of the defendant, who has ever since enjoyed it, under a lease obtained in the following manner :

Soon after making the verbal agreement with the defendant, doctor McKelway requested him to have it put in writing, to which Cook made excuses and occasioned delays, until the twenty-ninth of March, eighteen hundred and thirty-four. At this time all the contracts for building, and furnishing the materials for the mill, were entered into, and the amount it was to cost being thus ascertained, upon again requesting the respondent to put the agreement above stated in writing, Cook proposed, that as all the items of charge which in the aggregate were to fix the amount of the yearly rent, according to the agreement, were now known, a lease, in lieu of the agreement, should be drawn and executed, to be in all things based upon the stipulations of the verbal agreement, to which doctor McKelway consented. The lease follows :

" This indenture, made the twenty-ninth day of March, in

the year of our Lord eighteen hundred and thirty-four, between John McKelway, of the city of Trenton, county of Hunterdon, and state of New Jersey, of the one part; and James Cook, of the city, county and state aforesaid, of the other part, witnesseth, that the said John McKelway doth demise, grant and lease unto the said James Cook, his executors, administrators and assigns, all that lot of land situate in the said city, and adjacent to the Delaware Falls company's canal or raceway, with the saw-mill thereon erecting, which is to be built two stories high and completely finished in all its parts by the first day of June next ensuing, at the proper costs and charges of him the said John McKelway, and the said saw-mill to be supplied with water from the said Delaware Falls company's canal or raceway with a quantity equal to six horse power, the rent of which said water is to be paid by him the said John McKelway to the said Delaware Falls company: To have and to hold the said premises for the term of four years and ten months from the first day of June next ensuing, yielding and paying therefor yearly and every year (by quarterly payments) during the said term, the yearly rent of four hundred and forty-six dollars; that is to say, the sum of one hundred and eleven dollars and fifty cents on every quarter day from the commencement of this demise, except the first payment which falls due on the first day of July next ensuing, that being only one month's rent will be the sum of thirty-seven dollars and sixteen and two-thirds cents—And the said James Cook doth for himself, his heirs, executors and administrators, covenant with the said John McKelway, his heirs and assigns, that he, the said James Cook, his heirs, executors and administrators, shall pay to the said John McKelway, his heirs and assigns, the aforesaid yearly rent of four hundred and forty-six dollars, at the times appointed as aforesaid: And also that he the said James Cook, his executors, administrators or assigns, will during the said term, at his and their proper costs and charges, well and sufficiently repair all and every damage or damages which the said premises may sustain during the said term, so far as the same may be occasioned through the

carelessness or inattention of him the said James Cook, or his heirs or assigns: And the said John McKelway doth for himself, his heirs, executors and administrators, covenant with the said James Cook, his heirs and assigns, that he the said John McKelway, his executors, administrators or assigns, will during the said term, at his and their proper costs and charges, well and sufficiently repair and keep in repair the said premises so far as the same may become deranged through what is usually termed common or natural wear and tear: And also that the said John McKelway, for himself, his heirs, executors and administrators, guarantees that the said saw-mill shall have such a supply of water as to enable the said James Cook or his heirs or assigns to saw lumber therein ten months in each and every year from the commencement of this demise, and that an ample supply of water shall be had for eleven months in each and every year during the term aforesaid: But if there should, through any cause or causes whatever, be a failure of water so that the said James Cook, or his heirs or assigns, could not reap the advantage of the use of the said saw-mill and water for the time guaranteed, then a reduction of the rent shall take place in proportion to the time wanting in the guarantee as aforesaid, both as to the saw-mill and water: And lastly, that the said James Cook, his executors, administrators or assigns, at the expiration of the said term, shall and will yield up the said premises in good and sufficient repair (destruction by fire, war and tempest always excepted) unto the said John McKelway, his heirs and assigns.

The bill then proceeds to explain the clause of guaranty contained in the lease, by reciting parts of the eighth, ninth, and tenth articles of the printed proposals by the Trenton Delaware Falls company for renting their water, (which proposals are made part of the bill,) and charges, that it was under the provisions and obligations of those proposals that Doctor McKelway rented of the company the water for the mill, and that the guaranty in the lease was intended merely for the purpose of introducing the same, or similar obligations, between himself and

Cook, as his lessee, as under the proposals subsisted between the company and himself, as their lessee—and that the guaranty was not intended to impose upon Doctor McKelway the burden and expense of furnishing a greater quantity of water than that mentioned in the lease, should that prove insufficient to propel the mill, without an increase of rent to be paid, in proportion to the increased quantity of water called for.

Having thus explained the guaranty, the bill charges, that on the day of the execution of the lease, and at all times previous, it was given out by the Trenton Delaware Falls company, and was notoriously and universally the understanding of the mill owners upon their raceway, and of persons connected with, or in the employ of the company, and was undoubted and uncontradicted, that at the site of the said mill nine square inches of water under a three feet head constituted a horse power. And it is expressly alleged, that in several conversations between McKelway and Cook, both before, subsequent to, and about the time of the execution of the lease, it was stated and distinctly understood between them, that nine square inches under three feet head, drawn from the company's raceway at the site of McKelway's mill, was a horse power, according to the full meaning of the term as found in the lease.

By the sixth article of the proposals of the company, it is made obligatory upon all of their lessees to make and maintain in good repair the flumes and head-races of their respective mills, and also to construct and keep in repair an aperture and gate through which the water was to be drawn and measured, and for the neglect of so doing summary and legal remedies were stipulated. On the fifteenth of April, eighteen hundred and thirty-five, the company ordered a committee of their body to set the apertures, who proceeded under the order and set that of the complainant's mill on the fourth of September following. The aperture so set was sixty-five inches in length by one inch and three-eighths of an inch in width, forming an area, or opening, of eighty-nine and a quarter square inches, and was adjusted under a head of twelve inches, being equivalent to fifty-four

square inches of aperture under a three feet head, or to six horse power, according to the understanding of the parties at the date of the lease. It was then found that the power thus obtained would not drive the mill. McKelway then proposed to lease as much more as was necessary of the company, if Cook would obligate himself to pay the same increase of rent that the complainant would have to pay to the company. This Cook refused to do, but took out the aperture, and drew the water without measure from the company's raceway, contrary to their rules and proposals, binding upon McKelway, and thus exposing him to actions for damages.

The bill further charges, that in drawing the water thus upon the wheel of the mill without measure, the defendant drives the mill with such violence and irregularity as to cause unusual wear and damage to the machinery, and to jar, weaken, and irremediably damage the mill itself.

It is further charged, that Cook is in moderate circumstances, with but trifling if any real estate, and would not be able to respond in damages at law for the injury sustained by the mill, &c.

The bill prays an account for all damages the complainant has already sustained by the unlawful conduct of the said Cook, and also an injunction :

1. To restrain Cook from drawing excessive, unmeasured and unauthorized quantities of water from the raceway of the company upon the wheel of the mill, thereby jarring, weakening, and doing permanent injury to it.

2. Also, from using any other form or substance of aperture than that prescribed by the proposals of the company.

3. Also, from using a larger aperture than will supply a quantity of water equal to six horse power, according to the meaning of the lease, to wit, fifty-four square inches under a three feet head.

The defendant, by his answer, admits that McKelway owned the site, as charged; and that, having it in contemplation to erect a saw-mill thereon, some time in February, eighteen hundred and

thirty-four, William G. Cook proposed to him to rent the mill, and offered to pay therefor an annual rent, to amount, in addition to the sum which the doctor would have to pay for the water to the company, to ten per cent. on the actual cost of the mill, and sixty dollars per annum for the site. Before and at that time the defendant and his brother, William G. Cook, contemplated entering into partnership in the business of sawing lumber; and the defendant believes that the proposal was made by his brother, with the view of obtaining the mill for himself and the defendant; but no contract of partnership was then actually entered into between them, nor was there ever after; nor was his brother bound to admit the defendant to any benefit from the contract with the doctor; and denies that William G. Cook was his agent in making the agreement, or that he ever recognized him as such. And further, that if the agreement, as set forth in the bill, was made, it is without validity; or if binding upon W. G. Cook, still it was not binding upon the defendant, having been made without his procurement.

Admits that the mill was erected, but whether in pursuance of any agreement between W. G. Cook and doctor McKelway, or not, the defendant alleges himself to be ignorant; but believes the mill, as built, to be variant in its construction and dimensions from that contemplated by the doctor at the time of the alleged agreement. Subsequent to that time, Wm. G. Cook proposed to defendant to take the mill of the doctor, and carry on the business in his own name, and advised him so to do. Whereupon, defendant expressed to his brother his willingness to take a lease on the mill for a term of years; but denies that he ever recognized W. G. Cook as his agent in making the alleged agreement, or that he ever assented to the terms of such agreement; and does not recollect of any agreement, at any time, made between the doctor and himself, recognizing the terms of that agreement; but on the contrary charges, that being ignorant of the quantity of water requisite to drive the mill, and fearful of unusual expense in its erection, thereby enhancing the rent beyond his willingness to pay, and being unwilling to take a

lease at an uncertain rent, he insisted that some certain rent should be fixed upon before entering into any lease for the mill. Defendant admits that the doctor frequently applied to him to enter into written articles of agreement respecting the lease, but that he refused to do so until a fixed price should be agreed upon as rent ; and for proof that no binding agreement existed between them, he charges, that while these negociations were pending, the doctor stated to him, that unless he assented to the proposals respecting the lease, made to him by the doctor, that he would rent the premises to some other person ; and upon his refusing to comply, the doctor did offer the mill for rent or sale.

On or about the twenty-ninth of March, eighteen hundred and thirty-four, doctor McKelway proposed to Cook to build the mill two stories high, instead of one, as originally proposed, and to lease him the mill for four years and ten months, at a fixed rent; to which proposal he acceded, and a verbal contract was made, in pursuance of which the lease was executed, as set out in the bill. Neither admits or denies but that the amount of rent agreed upon between them, and inserted in the lease, was ascertained by the complainant in the manner alleged in the bill; but insists that it was not communicated so to him, and was not the basis of the contract on his part ; that so far as he acted, it was upon a simple proposal to pay a stipulated rent, without reference to any previous contract; that he, at that time, did not know the rent charged by the Delaware Falls company, for the use of the water necessary for the mill, nor was any exhibit made to him relative thereto ; that he then was, and is, ignorant of the cost of the mill, but believes that at the date of the lease, the cost of the mill was unknown to the complainant, and that material changes were made in its construction, after the date of the lease, whereby the cost was materially enhanced.

The answer further states, that pending the negociation respecting the lease, and about the time of its execution, the defendant being entirely ignorant of the science of hydraulics, and of the mode of measurement of flowing water, and being unacquainted with the subject practically, having had no experience

10

in relation thereto, applied to the engineer of the Trenton Delaware Falls company to ascertain the quantity of water necessary for the mill, who informed him that six horse power would be sufficient, in consequence of which he contracted for that quantity ; but that he was then ignorant of the quantity of water constituting a horse power, and supposed the complainant, he being landlord of the mill, and a stockholder in, and president of the company, knew the true quantity of water called for by the terms of the lease. Admits that, after the execution of the lease, he repeatedly heard it stated that nine square inches under a three feet head at the site of the mill, constituted a horse power; but does not recollect that, before the making of the lease, he ever heard it stated by any one, what constituted a horse power at that particular site, or at any other; and he expressly denies, that at the execution of the lease, or at any time prior, fifty-four square inches, under a three feet head, was designated or understood between himself and the doctor to be six horse power ; but that those terms were used in the lease in their appropriate and technical sense alone. That, by the plain terms of the lease, the complainant is bound to furnish six horse power of water, which requires seventy-four square inches under a three feet head.

Admits that the clause of guaranty in the lease was meant and intended as charged in the complainant's bill.

Admits that he entered into possession of the mill about the first of August, eighteen hundred and thirty-four, and continued therein, unmolested, until about the twenty-fourth of September, eighteen hundred and thirty-five, during all which time he received an ample supply of water ; but about that time the complainant procured an aperture to be fitted on the breasting of the mill, sixty-five inches in length, and one inch and three-eighths of an inch in width, the area being eighty-nine and a quarter square inches ; which was adjusted by the monument of the company, under a head, as defendant believes, of eleven inches and three-eighths of an inch. This aperture did not vent a quantity of water equivalent to a six horse power, according to the understanding of the parties and the true intent and meaning of the

lease. By the setting of the aperture a further supply of water was cut off from the mill, and the aperture would not pass sufficient water to drive the mill so as to answer any useful purpose, and the mill was consequently stopped. The aperture was put in contrary to the will, and against the remonstrances of the defendant, and after it had remained in about five days, during which time it prevented the mill from working, defendant caused it to be removed, and the water to be let freely on the wheel, as before; but he denies that he has drawn a great or unnecessary quantity of water upon the wheel, or that it has been driven with such violence or irregularity as to injure the mill.

Alleges that since the mill has been in operation, it has been ascertained that the quantity of water contracted for in the lease, is not sufficient for the use of the mill, and that he has drawn on the wheel, since the same has been in operation, a quantity of water equal, as he believes, to six horse power and a sixth of a horse power, or two square inches under a three feet head more than was specified and contracted for in the lease, for which he offered to the complainant to pay, before the aperture was put in, in addition to the rent specified by the lease, the rent required by the Delaware Falls company for such additional quantity, and that he is ready still to pay the same.

Does not know whether the aperture was put in by the direction of the company or not, but presumes not, as no apertures have been placed on any of the other mills. The company, he alleges, have not objected to his using the water, nor has he used it to the damage of any of the other lessees, nor has the complainant been subjected to any forfeiture or damage by reason thereof.

The cause came on for hearing upon bill, answer, replication and proofs.

*Hamilton* and *I. H. Williamson*, for complainant.

*H. W. Green* and *W. Halsted*, for defendant.

THE CHANCELLOR. ' In this case the complainant, on the twenty-ninth of March, eighteen hundred and thirty-four, leased to the defendant a saw-mill in Trenton, for the term of four years and ten months, at a rent of four hundred and forty-six dollars, including the privilege of drawing from the canal of the water-power company, for the use of the mill, a quantity of water equal to "six horse power," without any description of what quantity of water, at that situation, was to be considered as "a horse power."

The bill charges, that the complainant had made a verbal agreement with William G. Cook, the brother of the defendant, for a lease of the same mill, by which it was agreed that he should pay by way of rent sixty dollars for the lot, ten per cent. upon the cost of the mill, and three dollars per square inch for the water, and that this lease was made with reference to that verbal agreement, and the rent adjusted accordingly. And the bill further charges that it was the universal understanding with the mill owners and with the water power company, that at this situation, with the head and fall of water which existed there, nine square inches of water were equal to a horse power, and that this lease was made with that understanding both on the part of the complainant and defendant.

In conformity with this understanding, the complainant, in adjusting the aperture to discharge the water on to the wheel of the mill, fixed it at fifty-four square inches, equal to a six horse power at nine inches per horse power. The defendant removed this aperture, and put another aperture equal to seventy-two square inches and claims a right to draw from that aperture; and to restrain him from drawing more water than would flow through an aperture of fifty-four square inches is the principal object of the bill. The defendant, in his answer, denies that the lease was made in conformity with the verbal agreement which had been made with his brother, or that in making the lease nine square inches were considered as a horse power, and alleges that he refused to execute any agreement until the rent could be fixed and made certain as to amount; that he was informed by

[McKelway v. Cook.]

the engineer that a six horse power would be sufficient to drive the mill, and that the terms were used in the lease in their technical sense; that he did not know what aperture would give a horse power, and that after the lease was executed he understood that an aperture of nine square inches would give a horse power.

From the evidence in the case, it is manifest that it was the general impression among those interested in the water power and mills and property upon it, that it would require an aperture of but nine square inches at this location to give one horse power, and it is equally manifest that this impression arose from a mistaken calculation of the engineer, and that in point of fact it required an aperture of twelve square inches at that location to give a horse power. It was not a mistake as to the extent of a horse power, according to its technical meaning, but the mistake arose in calculating the extent of an aperture which would yield that power.

If the complainant would limit the defendant to the measurement of an aperture of nine square inches for a horse power, it would be necessary for him to show, not only that such was the general impression, but he must show that the defendant agreed to this manner of measuring the horse power. It would not be sufficient to prove that even the defendant himself, at the time of the lease, was under the impression that an aperture of nine square inches would yield a horse power, for he might have had that impression and yet been unwilling to make a contract upon it.

What is the evidence as to this point? The bill alleges, that the lease was made with reference to this parol agreement with the brother, whereby the rent was adjusted at three dollars per square inch. The answer expressly denies this part of the bill, and upon this answer the defendant may rest, unless there is evidence to contradict the answer in this respect.

Upon examining the testimony I cannot find that this allegation of the answer is contradicted; on the contrary it appears to be confirmed by all the testimony which applies to this point.

10*

A lease was made out by Mr. Lott, which was in conformity with this verbal agreement of the brother, fixing the rent at sixty dollars for ground rent, ten per cent. on cost of mill, and three dollars per inch for the water. This lease the defendant refused to execute, because the amount of rent was uncertain. The lease now in dispute was then made out by Mr. Evans; which was executed; and at the time this lease was executed Mr. Evans says that "something was said about a lease having been drawn by Mr. Lott, but never had been executed. Mr. Cook said he did not like it."

This evidence is in confirmation of the defendant's answer, and shows that he would not make the contract until the amount of the rent was settled and fixed. From information derived from the engineer, he knew or believed that a six horse power was sufficient to drive the mill, and therefore was willing to contract for a six horse power, but was not willing that the rent should be uncertain, and therefore refused to sign the first lease, which was uncertain as to the amount of rent, both as respects the ten per cent. upon the cost and the three dollars per square inch of water, that might be required to drive the mill.

In this stage of the negociation I presume that the complainant undertook to establish in his own mind what rent he would charge, and in adjusting it he set down sixty dollars for ground rent, then ascertained the cost or probable cost of the buildings, and took ten per cent. of that cost for the next item, and then, being under the impression that nine square inches would give a horse power, and as the defendant wanted a six horse power; he made his calculation upon fifty-four square inches of water, and thus made up the amount of four hundred and forty-six dollars as the rent of the whole; and the defendant agreed to this amount, and the lease was accordingly executed. But it turns out that the complainant was mistaken in his impression that nine square inches would make a horse power at that place, and that it in fact requires twelve square inches to give that power. If under these circumstances it should be admitted by the defendant that he was under the impression at that time, that an

[McKelway v. Cook.]

aperture of nine spuare inches at that place would give a horse power, I can see no reason why he should suffer for the mistake. He would not take upon himself the risk of these impressions being correct. He undoubtedly intended to bargain for enough water to drive the mill, and satisfied himself that a six horse power would do it, and there is no evidence that he agreed as to any particular manner of measuring the quantity of water that would yield that power.

In order to test the principle, let it be supposed that the mistake had been the other way, and that in fact six square inches at that place would have given a horse power, and the defendant had insisted that his rent should be received in that ratio, he would have been told that the water was offered to him by the inch, but that he would not take it so, and insisted upon having the rent fixed at a sum certain.

Again, supposing it had turned out that the complainant had made a mistake in estimating the cost of the mill, and instead of costing him two thousand two hundred and forty dollars (as alleged,) it had cost him three thousand two hundred and forty dollars, thereby making a difference in the rent of one hundred dollars (according to the views of the complainant,) could he with propriety have called upon the defendant to pay the added rent of one hundred dollars upon discovering this mistake? I apprehend not; in either case the mistake was made by the complainant and he must suffer the loss in consequence of that mistake.

I am therefore of opinion that the defendant, by virtue of his lease, is entitled to draw a quantity of water equal to a six horse power, and to use an aperture which will yield that power. As to the allegation that the mill is injured by the use of too much water, and thereby driving it too fast, if it was a case for the interference of this court there is no evidence of such continued or threatened irreparable injury as to authorize the exercise of its power. Let the bill be dismissed, with costs.

* Decree accordingly.

* An appeal having been taken by the complainant, this decree was unanimously affirmed, with costs, by the court of appeals, at a special term, in January, eighteen hundred and forty.